**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| | x | |
| In re: | : | Chapter 11 |
| | : | |
| PACIFIC DRILLING S.A., *et al.*,[1] | : | Case No. 20-35212 (DRJ) |
| | : | |
| | : | (Joint Administration Requested) |
| Debtors. | : | |
| | x | |

**DECLARATION OF JAMES HARRIS,
CHIEF FINANCIAL OFFICER OF THE DEBTORS, IN
<u>SUPPORT OF THE CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS</u>**

I, James Harris, hereby declare under penalty of perjury:

1.      I am the Chief Financial Officer and Senior Vice President of Pacific Drilling S.A., a public limited liability company (*société anonyme*) organized under the laws of the Grand Duchy of Luxembourg ("**PDSA**") and one of the above-captioned debtors and debtors in possession (collectively, the "**Debtors**").  I have served as Chief Financial Officer and Senior Vice President of PDSA since July 2019, and I am generally familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records.

2.      In my capacity as Chief Financial Officer of PDSA, I oversee and manage the finances of the Debtors and their non-Debtor affiliates (collectively, "**Pacific Drilling**" or the "**Company**"), and I am responsible for the Debtors' accounting, reporting, budgeting, taxes, treasury, and corporate planning.

---

[1]      The Debtors in these cases, along with the last four digits of each Debtor's U.S. federal tax identification number, to the extent applicable, are: Pacific Drilling S.A. (5724), Pacific Bora Ltd. (9815), Pacific Drilling Operations Limited (9103), Pacific Drilling Operations, Inc. (4446), Pacific Drilling, Inc. (1524), Pacific Drilling, LLC (7655), Pacific Scirocco Ltd. (0073), Pacific Sharav S.À R.L. (2431), Pacific Drilling Holding (Gibraltar) Ltd. (3754), Pacific Drilling Company Limited (4275), Pacific Sharav Korlátolt Felelősségű Társaság (4898), Pacific Drillship Nigeria Limited (0281), Pacific Drilling Finance S.À R.L., Pacific Drilling Limited, Pacific Drilling V Limited, Pacific Drilling VII Limited, Pacific Drillship S.À R.L., Pacific Mistral Ltd., and Pacific Santa Ana Limited.

3.      On the date hereof (the "**Petition Date**"), each of the Debtors filed voluntary petitions in the United States Bankruptcy Court for the Southern District of Texas (the "**Court**") commencing cases (the "**Chapter 11 Cases**") for relief under of Title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "**Bankruptcy Code**").

4.      I submit this declaration (the "**Declaration**") to assist the Court and parties in interest in understanding the circumstances that compelled the commencement of the Chapter 11 Cases and to support (a) the aforementioned petitions for relief, and (b) the emergency relief that the Debtors have requested from the Court pursuant to the motions and applications described herein (collectively, the "**First Day Motions**").[2]

5.      The Debtors commenced these "prenegotiated" Chapter 11 Cases for the purpose of implementing an agreed restructuring of the Debtors' 8.375% First Lien Notes due 2023 (the "**Prepetition First Lien Notes**") and 11.0%/12.0% Second Lien PIK Notes due 2024 (the "**Prepetition Second Lien PIK Notes**").  On the Petition Date (immediately prior to the filing of the voluntary petitions), the Debtors entered into a Restructuring Support Agreement (the "**RSA**") with members of an ad hoc crossover group comprised of certain first and second lien creditors (the "**Ad Hoc Crossover Group**") in addition to certain other second lien creditors.[3]  In the aggregate, creditors party to the RSA holding more than 72% of outstanding Prepetition First Lien Notes and more than 73% of outstanding Prepetition Second Lien PIK Notes.  As contemplated by the RSA, on the Petition Date, the Debtors filed the *Joint Plan of Reorganization of Pacific Drilling S.A. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (the

---

[2]      The factual support for the First Day Motions is set forth in **Exhibit A** to this Declaration.

[3]      A copy of the RSA is annexed hereto as **Exhibit C**.

US-DOCS\117404149.41

"**Plan**"),[4] and the *Disclosure Statement for the Joint Plan of Reorganization of Pacific Drilling S.A. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (the "**Disclosure Statement**") in order to effectuate the restructuring contemplated by the RSA in an expeditious and value-maximizing manner.

6.      Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with other members of the Debtors' management team and advisors (including legal counsel), my review of relevant documents and information concerning the Debtors' operations, financial affairs, and restructuring process, or my opinions based upon my experience and knowledge.  If called as a witness, I could and would testify competently to the facts set forth in this Declaration.  I am over the age of 18 and authorized to submit this Declaration on the Debtors' behalf.

7.      Part I of this Declaration provides an overview of the Debtors' proposed restructuring.  Part II provides an overview of the Debtors' business and organizational structure. Part III provides an overview of the Debtors' prepetition capital structure and indebtedness.  Part IV provides an overview of the circumstances leading to the commencement of the Chapter 11 Cases.  Part V summarizes the key terms of the proposed restructuring and the proposed timeline for the Chapter 11 Cases, and Part VI summarizes the relief sought in the First Day Motions and the bases for such relief.

I.      **Overview**

8.      The Debtors are commencing the Chapter 11 Cases after extensive discussions over the past several months with certain of their key creditor constituencies.  As a result of these

---

[4]      Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

US-DOCS\117404149.41

negotiations, the Debtors entered into the RSA with the Ad Hoc Crossover Group and certain other holders of the Prepetition Second Lien PIK Notes.  Under the terms of the RSA, the Debtors, the Ad Hoc Crossover Group, and certain other holders of the Prepetition Second Lien PIK Notes agreed to the terms of a proposed plan of reorganization whereby over $1 billion of secured debt will be exchanged for equity (the "**Restructuring**").  Specifically, the Restructuring contemplates the equitization of all amounts outstanding under the Debtors' Prepetition First Lien Notes and Prepetition Second Lien PIK Notes and the financing of the Debtors' ongoing business.  It is my understanding, based upon information contained in the Disclosure Statement (including the Company's implied reorganization value), that such equitization will leave the holders of claims arising under the Prepetition First Lien Notes (the "**First Lien Notes Claims**") impaired and the holders of claims arising under the Prepetition Second Lien PIK Notes (the "**Second Lien Notes Claims**") substantially impaired.  Accordingly, there is insufficient value to provide any recovery to the Debtors' unsecured creditors and equityholders.

9.      The Plan also contemplates the commencement of a parallel Cayman Islands insolvency proceeding in order to implement the Restructuring.  Prior to the Petition Date, PDSA, among other things, formed a new Cayman Islands subsidiary, Debtor Pacific Drilling Company Limited ("**PDCL**"), and contributed all of PDSA's assets to PDCL in exchange for the equity interests in PDCL.  Consistent with PDSA's debt documents, PDCL became a secured guarantor of the Prepetition First Lien Notes and Prepetition Second Lien PIK Notes.  Beginning on October 30, 2020, PDCL authorized and initiated steps necessary to commence a parallel insolvency proceeding in the Cayman Islands to effectuate and gain recognition of the Restructuring in the Cayman Islands (the "**Cayman Proceedings**").  Pursuant to the terms of the Plan, PDSA's common stock will no longer be listed on the New York Stock Exchange ("**NYSE**"), and PDSA

will take steps to expeditiously terminate its registration under the Securities Exchange Act of 1934.  On the Plan Effective Date, reorganized PDCL will issue new equity (the "**New PDC Equity**") to the holders of First Lien Notes Claims and Second Lien Notes Claims and will issue or execute all instruments, certificates, and other documents required to implement a new senior secured delayed draw term loan credit facility in the aggregate principal amount of up to $80 million (the "**Exit Facility**").

10.     The Debtors seek to obtain confirmation of the Plan as quickly as the Court's schedule and requisite notice periods will permit.  In order to comply with milestones set forth in the RSA (the "**Milestones**") and to emerge from bankruptcy as swiftly as practicable, the Debtors have proposed the following timetable:

| Event | Date/Deadline | Days After Petition Date |
|---|---|---|
| Petition Date | October 30, 2020 | N/A |
| Voting Record Date | November 6, 2020 | 7 |
| Conditional Disclosure Statement Approval Hearing | November 12, 2020 at 9:00 a.m. (Prevailing Central Time) | 13 |
| Commencement of Solicitation | November 16, 2020 | 17 |
| Mailing of Ballots and Notice of Non-Voting Status | November 18, 2020 | 19 |
| Mailing of Cure Notice | November 23, 2020 | 24 |
| Deadline to file Plan Supplement | December 4, 2020 | 35 |
| Objection Deadline for Cure Notices | December 11, 2020 at 4:00 p.m. (Prevailing Central Time) | 42 |
| Objection Deadline for Plan and Disclosure Statement | December 14, 2020 at 4:00 p.m. (Prevailing Central Time) | 45 |
| Voting Deadline | December 14, 2020 at 5:00 p.m. (Prevailing Central Time) | 45 |
| Deadline to file Proposed Confirmation Order | December 18, 2020 | 49 |
| Plan and Disclosure Statement Reply Deadline | December 18, 2020 at 4:00 p.m. (Prevailing Central Time) | 49 |
| Combined Hearing to Consider Approval of Disclosure Statement on Final Basis and Confirmation of Plan | December 21, 2020 at 10:30 a.m. (Prevailing Central Time) | 52 |

11.     Concurrent with the filing of this Declaration, the Debtors filed a motion seeking, among other things, (a) conditional approval of the Disclosure Statement and associated forms at a hearing to be held approximately 12 days after the Petition Date, and (b) to schedule a combined hearing to consider approval of the Disclosure Statement on a final basis and confirmation of the Plan (the "**Disclosure Statement Motion**").  Under the terms of the RSA, holders of more than 66.67% of First Lien Notes Claims and Second Lien Notes Claims agreed to vote to accept the Plan.

12.     Against the backdrop of the current depressed state of the oil industry and the attendant impact of such downturn on the Company's business and value (all of which is discussed in depth below), the Restructuring proposed by the Debtors will maximize the value of the Debtors' business for the benefit of the applicable stakeholders.  The Restructuring will leave the Debtors' business intact and completely delevered, providing for the permanent reduction of over $1 billion of debt.  This deleveraging will enhance the Debtors' long-term growth prospects and competitive position and allow the Debtors to emerge from the Chapter 11 Cases as reorganized entities better positioned to succeed in the drilling services industry.

13.     As set forth below, the Plan provides for a recovery to holders of First Lien Notes Claims and Second Lien Notes Claims in the form of stock, or a combination of stock and warrants, respectively.  As noted above, the recoveries leave the holders of First Lien Notes Claims impaired and the holders of Second Lien Notes Claims substantially impaired.  Distributions of common equity (and, as to one class of claims, warrants) in reorganized PDCL will allow the Debtors' prepetition noteholders to participate in the potential future upside of the Debtors, as reorganized pursuant to the terms of the Plan (the "**Reorganized Debtors**").  I believe that, under the circumstances, the Plan and all actions taken to effectuate the transactions described in the RSA

and the Plan (collectively, the "**Restructuring Transactions**") represent the best outcome available to the Debtors and their stakeholders.

14.     Consummating the Restructuring in a timely manner, however, is of critical importance.  A swift and efficient Chapter 11 process is not only necessary to comply with the Milestones contained in the RSA but is also necessary to enable the Debtors to maintain their customer base and relationships with vendors and business partners.  Due to the Debtors' lean management organization—which allows clients to have regular access to experienced, senior leadership with direct knowledge of Pacific Drilling's day-to-day operations—customer trust has become integral to the success of the Debtors' business.  The Debtors anticipate, however, that some of their competitors will seek to undermine customer trust so long as the Debtors' Chapter 11 Cases remain pending.  Additionally, many of the Debtors' main competitors are already currently undergoing their own Chapter 11 processes putting the Debtors behind their competitors in being able to capture market share with a clean balance sheet upon emergence.  An expeditious emergence from Chapter 11 will minimize these and other adverse effects of the Chapter 11 filing upon the Debtors' business.

## II.     The Debtors' Business and Organizational Structure

### A.     The Debtors' Business

15.     Pacific Drilling is an international offshore drilling contractor whose primary business is to contract its fleet of seven high-specification drillships to drill wells for clients in the global offshore oil exploration and production industry.  Pacific Drilling believes it owns and operates the only deepwater fleet comprised solely of sixth and seventh generation high-specification drillships and that its fleet offers premium technical capabilities to its clients.  Pacific Drilling's industry-leading operational performance is grounded in its core values, emphasis on client relationships, and entrepreneurial culture.  Pacific Drilling is committed to exceeding its

US-DOCS\117404149.41

clients' expectations by delivering the safest, most efficient and reliable deepwater drilling services in the industry.

16.     Pacific Drilling's high-specification fleet consists of three seventh generation drillships—the *Pacific Sharav* and the *Pacific Khamsin*, both owned by Debtor Pacific Sharav Korlátolt Felelösségü Társaság, and the *Pacific Meltem*, owned by Debtor Pacific Drilling VII Limited—and four sixth generation drillships—the *Pacific Santa Ana*, owned by Debtor Pacific Santa Ana Limited, the *Pacific Bora*, owned by Debtor Pacific Bora Ltd., the *Pacific Scirocco*, owned by Pacific Scirocco Ltd., and the *Pacific Mistral*, owned by Debtor Pacific Mistral Ltd.

17.     Pacific Drilling provides drilling services on a "dayrate" contract basis.  Under dayrate contracts, Pacific Drilling provides drillships and rig crews to customers in exchange for a fixed amount per day regardless of the number of days required to drill a given well.  Under certain contracts, Pacific Drilling may also provide additional third-party services integrated into the standard drilling contract, which result in additional revenue, costs and associated downtime risk.  The customer, not Pacific Drilling, bears substantially all of the ancillary costs of constructing the well and supporting drilling operations, as well as the economic risk and reward relative to the success of the well.

18.     Pacific Drilling's drillships are long-lived assets, with an average useful life exceeding 25 years, and some of the newest and most technologically advanced drillships in the world.  During its useful life, the economic value of a drillship to Pacific Drilling can be expected to fluctuate up and down based on market circumstances—chiefly, the supply of and demand for drillships with similar well-construction capabilities.  These supply and demand factors are more important than the nominal age of the vessel in determining the economic value of the drillships to Pacific Drilling over the next decade.  Pacific Drilling does not rely on an outside company to

manage its fleet or provide offshore drilling services.   Instead, dedicated teams provide management and corporate services through wholly-owned non-Debtor subsidiaries.

19.     Further, neither PDSA nor any of the other Debtors have any employees of their own.  Rather, Pacific Drilling's employees are employed by one of the following five non-Debtor subsidiaries of PDSA: Pacific Drilling Manpower, Inc. ("**PDMI**"), Pacific Drilling Manpower Ltd. ("**PDML**"), Pacific Drilling International Ltd. ("**PDIL**"), Pacific Drilling Manpower SARL ("**PDMS**"), and Pacific International Drilling West Africa Limited ("**PIDWAL**" and, together with PDMI, PDML, PDIL, and PDMS, the "**Non-Debtor Employers**").   Specifically, as of October 21, 2020, the Non-Debtor Employers employ the following number of people at the following locations:

| Non-Debtor Employer | Number of Employees | Location of Employees |
| --- | --- | --- |
| *PDMI* | 327 | U.S. citizens working in the Gulf of Mexico and Houston. |
| *PDML* | 90 | Non-U.S. citizens working outside the U.S. |
| *PDIL* | 22 | U.S. citizens working outside the U.S. |
| *PDMS* | 2 | European citizens working in Luxembourg. |
| *PIDWAL* | 2 | Nigerian citizens working in Nigeria. |

20.     As a service provider, Pacific Drilling's employees are critical to delivering efficient operations for its clients and optimizing revenues.   Pacific Drilling's drillships are manned by highly professional and experienced crews, and its office employees (including the Debtors' senior management team) provide accounting, administrative, client, financial, legal, management, operational, safety, sales, technical, and other support services for Pacific Drilling from its operational headquarters in Houston, Texas and other offices around the world.   These employees, among other things, implement a complex system of management policies, procedures and processes to ensure a safe and efficient execution of drilling operations.   The system allows Pacific Drilling to coordinate the complex web of interdependent activities involved in deepwater

offshore drilling, including streamlined coordination and communication between the onshore and offshore teams.

21.     Pacific Drilling's clients are large national, major or independent oil and gas companies, and have included Chevron Corporation, Eni S.p.A., Petroliam Nasional Berhad ("**Petronas**"), Total S.A. Group ("**Total**"), Equinor ASA ("**Equinor**"), Petróleo Brasileiro S.A., and Murphy Oil Corporation ("**Murphy Oil**").  Deepwater exploration and production is a capital-intensive and high-risk industry, with substantial investment required to effectively conduct operations.  Offshore production is an important component of the business of the largest energy production companies in the world and a major contributor to their profitability.  Pacific Drilling's high-specification drillships are specifically designed to meet the requirements of these large, sophisticated customers.  Historically, the revenue earned from the operation of each drillship currently contracted is sufficient to pay the operating costs of such drillship in addition to a share of Pacific Drilling's overhead and financing costs.

22.     Worthy of emphasis is the fact that the offshore contract drilling industry is highly cyclical and volatile.  The substantial drop in oil prices that began in 2014 resulted in a significant decline in drilling activity and an oversupply of high-specification floating rigs that, in turn, led to a significant decline in dayrates and lower utilization of drillships over the past few years—a trend that has only accelerated as a result of the COVID-19 pandemic and the oil market share war between the Organization of the Petroleum Exporting Countries ("**OPEC**") and a group of oil producing nations led by Russia (as discussed in greater detail below).  These cycles have historically lasted five to ten years, with drillship utilization fluctuating from below 60% up to 99%, and dayrates fluctuating from breakeven costs of approximately $130,000–$180,000 per day up to $700,000 per day.

**B.      The Debtors' Current Fleet Status**

23.      As discussed in greater detail below, the COVID-19 pandemic and the oil market share war have exacerbated the cycles in the deepwater drilling market.  As a result, the Debtors are experiencing a significant decrease in demand for their drillships.  Only three (of seven) of the Debtors' drillships are currently operating under contracts for work, with one of those drillships finishing up its work and the two remaining drillships in "stand-by" mode.  Specifically, the *Pacific Khamsin* is currently operating for customers in the Gulf of Mexico under a contract with Equinor/Total that started in December 2019 at a dayrate of approximately $222,000, with the ongoing work with Total expected to end in early November 2020.  The *Pacific Santa Ana* is currently under a contract with a subsidiary of Petronas to perform integrated services for a plug and abandonment project estimated to last 350 days but, due to force majeure caused by the COVID-19 pandemic, is currently on stand-by at 35% of the contractual dayrate of approximately $296,000, inclusive of integrated services.  On September 30, 2020, Petronas provided notification that work for the rig will resume on January 1, 2021.  The *Pacific Sharav* is currently idle in the Gulf of Mexico awaiting commencement of its work in the second quarter of 2021 for Murphy Oil on a 10-well contract with an estimated duration of approximately 450 days with the option for five additional wells at a dayrate of $180,000.

11

24.     As of the Petition Date, the status of Debtors' fleet is as follows:

| Drillship | Customer | Location | Contractual Dayrate | Availability / Expected Availability |
|---|---|---|---|---|
| **Under Contract** | | | | |
| *Pacific Khamsin* | Equinor/ Total | USGoM | $222,000 | • November 2020 |
| *Pacific Santa Ana* | Petronas | Mauritania | $296,000[5] | • September 2021 <br> • Current contract is on stand-by status until January 1, 2021 at 35% of the contractual dayrate |
| *Pacific Sharav* | Murphy | USGoM | $180,000 | • June 2022 <br> • Current contract estimated to commence in Q2 2021 <br> • Currently idle in the Gulf of Mexico |
| **Smart Stacked** | | | | |
| *Pacific Bora* | --- | Oman | --- | Immediate |
| *Pacific Mistral* | --- | Las Palmas | --- | Immediate |
| *Pacific Scirocco* | --- | Las Palmas | --- | Immediate |
| *Pacific Meltem* | --- | Las Palmas | --- | Immediate |

## C.     The Debtors' Organizational Structure and Recent History

25.     The Company began operations in 2006 as Pacific Drilling Limited, organized in Liberia ("**PD Limited**").  With its business successes and acquisition of additional vessels, the Company grew rapidly.  On March 11, 2011, PDSA was formed as a new Luxembourg public limited liability company, and PD Limited became a wholly-owned subsidiary.  PDSA reached its peak market-implied equity value of approximately $2.7 billion in 2013.

26.     Because of the substantial drop in oil prices that commenced in mid-2014 and the consequential decrease in demand for the Company's drillships, PDSA and certain of its affiliates (the "**2017 Debtors**") filed voluntary Chapter 11 petitions in the United States Bankruptcy Court for the Southern District of New York on November 12, 2017 in cases styled as *In re Pacific*

---

[5]     Full contractual dayrate prior to application of standby rate.

US-DOCS\117404149.41

*Drilling S.A.*, et al., Case No. 17-13193 (MEW) (the "**2017 Bankruptcy Proceedings**"). The plan of reorganization of certain of the 2017 Debtors[6] was confirmed by the *Findings of Fact, Conclusions of Law, and Order Confirming Fourth Amended Joint Plan of Reorganization for Pacific Drilling S.A. and Certain of its Affiliates Pursuant to Chapter 11 of the Bankruptcy Code*, entered on November 2, 2018 [Docket No. 746]. Upon emergence of all of the 2017 Debtors (other than the Zonda Debtors) from the 2017 Bankruptcy Proceedings on November 19, 2018, the Company had $1.5 billion in new capital, before expenses, consisting of (a) approximately $1 billion raised through the issuance of the Prepetition First Lien Notes and the Prepetition Second Lien PIK Notes, and (b) $500 million raised through the issuance of new common shares pursuant to a private placement and a separate equity rights offering.

27.     The corporate structure chart attached hereto as **Exhibit B** (the "**Structure Chart**") provides a general overview of the current corporate structure and the relationship among PDSA and its Debtor and non-Debtor subsidiaries.

28.     As indicated on the Structure Chart, the Debtors are organized under the laws of several countries: the British Virgin Islands, Gibraltar, Hungary, Luxembourg, Liberia, the Cayman Islands, and the United States. The Company maintains its principal executive office and registered office in Luxembourg and its operational headquarters in Houston, Texas, where its senior management team and the majority of its shore-based employees are located.

---

[6]     Two of the Company's non-Debtor subsidiaries—Pacific Drilling VIII Limited and Pacific Drilling Services, Inc. (together, the "**Zonda Debtors**")—were involved in an arbitration dispute and remain as debtors in the Company's 2017 Bankruptcy Proceedings. The Zonda Debtors filed their own plan of reorganization (the "**Zonda Plan**") in those proceedings. On October 15, 2020, the Zonda Debtors received notice that their application for permission to appeal the arbitration award that was rendered against them on January 15, 2020 was denied. The Company expects that the Zonda Debtors will be liquidated in accordance with the terms of the Zonda Plan. The Debtors do not believe the Zonda Debtors have any valid claims against the Debtors, but any claims that the Zonda Debtors may attempt to assert against the Debtors in these Chapter 11 Cases would be classified as General Unsecured Claims and receive no recovery under the Plan. For information on the Zonda Plan, please visit the Zonda Debtors' claims agent website at: https://cases.primeclerk.com/pacificDrilling/Home-Index.

29.     PDSA owns, directly or indirectly, all of the equity of each of its subsidiaries, with the exception of four entities—(a) non-Debtor PIDWAL, which is a Nigerian joint venture that is 49% owned by Debtor Pacific Drilling Operations Ltd. and 51% owned by third-party Derotech Offshore Services Limited ("**Derotech**"), a privately-held Nigerian registered limited liability company, (b) Debtor Pacific Drillship Nigeria Limited ("**PDNL**"), which is 0.1% owned by Debtor Pacific Drilling Limited ("**PDL**") and 99.9% owned by PIDWAL, (c) Debtor Pacific Bora Ltd, which is 49.9% owned by PDL and 50.1% owned by PDNL, and (d) Debtor Pacific Scirocco Ltd, which is also 49.9% owned by PDL and 50.1% owned by PDNL.

### III.     The Debtors' Prepetition Capital Structure

30.     As of the Petition Date, the Debtors' principal non-contingent liabilities consist of outstanding funded debt under the Prepetition First Lien Notes and the Prepetition Second Lien PIK Notes in an aggregate outstanding principal amount of $1.076 billion (the "**Prepetition Debt**").[7]  The Debtors have no other funded indebtedness.  The following description of the Debtors' Prepetition Debt is for informational purposes only and is qualified in its entirety by reference to the documents setting forth the specific terms of such obligations and their respective related agreements (the "**Prepetition Debt Instruments**").

31.     As the ultimate parent holding company, PDSA directly or indirectly wholly owns all other Debtor and non-Debtor subsidiaries (other than, as discussed above, the subsidiaries partly owned by Derotech).  The Company cannot provide drilling services without the proper functioning of the Debtor subsidiaries that own or charter the drillships or that have borrowed,

---

[7]     Prior to the Petition Date, the Debtors repaid all outstanding amounts owed under that certain revolving credit agreement, dated as of February 7, 2020, by and among PSDA, as borrower, the lenders party thereto, and Angelo, Gordon Energy Servicer, LLC, as Administrative Agent (the "**Revolving Credit Facility**").  As a result, the Revolving Credit Facility has been terminated.

US-DOCS\117404149.41

issued or guaranteed the different facilities comprising the Prepetition Debt (the "**Drillship Subsidiaries**").

32.     In addition to claims against PDSA, the various holders of the Prepetition Debt hold claims against various Drillship Subsidiaries, as well as certain other Debtor subsidiaries that have issued guarantees or granted limited recourse share pledges to such holders.  Claims against the Drillship Subsidiaries and the other guarantors under the Prepetition Debt Instruments are secured by the drillships and substantially all other assets of the Debtors.

**A.**     **The Prepetition First Lien Notes**

33.     As of the Petition Date, approximately $750 million in principal amount is outstanding under the Prepetition First Lien Notes issued by Pacific Drilling First Lien Escrow Issuer Limited, a private company limited by shares incorporated in the British Virgin Islands (the "**First Lien Escrow Issuer**") under that certain Indenture dated as of September 26, 2018 (as amended, restated, modified, supplemented, or replaced from time to time in accordance with the terms thereof, the "**First Lien Notes Indenture**"), by and among the First Lien Escrow Issuer, the guarantors named thereunder, and Wilmington Trust, National Association ("**Wilmington Trust**"), as trustee and collateral agent.  Upon PDSA's emergence from the 2017 Bankruptcy Proceedings, the First Lien Escrow Issuer merged into PDSA and PDSA assumed all obligations of the First Lien Escrow Issuer under the First Lien Notes Indenture.

34.     The Prepetition First Lien Notes mature on October 1, 2023, and bear interest at 8.375% per annum.  Interest payments are due semi-annually on April 1 and October 1 of each year (subject to a thirty-day grace period).  The Prepetition First Lien Notes are jointly and severally and fully and unconditionally guaranteed on a senior secured basis by all of the Company's subsidiaries other than a few of the non-Debtors, including the Zonda Debtors, the Non-Debtor Employers, and certain immaterial subsidiaries.

US-DOCS\117404149.41

35.     The Prepetition First Lien Notes are secured by first-priority liens on substantially all assets of the Company and the guarantors (other than certain excluded property), including (a) vessels, (b) books and records, (c) deposit accounts and the amounts contained therein, (d) assignments of proceeds of hull and machinery and loss of hire insurance, (e) assignments of earnings from drilling contracts, and (f) equity interests owned by the Company and the guarantors, in each case, subject to certain limited exceptions.

**B.      The Prepetition Second Lien PIK Notes**

36.     As of the Petition Date, approximately $326 million in principal amount is outstanding under the 11.000%/12.000% Prepetition Second Lien PIK Notes issued by Pacific Drilling Second Lien Escrow Issuer Limited, a private company limited by shares incorporated in the British Virgin Islands (the "**Second Lien Escrow Issuer**") under that certain Indenture dated as of September 26, 2018 (as amended, restated, modified, supplemented, or replaced from time to time in accordance with the terms thereof, the "**Second Lien Notes Indenture**"), by and among the Second Lien Escrow Issuer, the guarantors named thereunder, and Wilmington Trust, as trustee and junior lien collateral agent.  Upon PDSA's emergence from the 2017 Bankruptcy Proceedings, the Second Lien Escrow Issuer merged into PDSA and PDSA assumed all obligations of the Second Lien Escrow Issuer under the Second Lien Notes Indenture.

37.     The Prepetition Second Lien PIK Notes mature on April 1, 2024.  For each interest period, interest is payable, at the option of PDSA, (a) entirely in cash ("**Cash Interest**"), (b) entirely through the issuance of additional Prepetition Second Lien PIK Notes in a principal amount equal to the amount of interest then due and payable or by increasing the then outstanding aggregate principal amount of Prepetition Second Lien PIK Notes ("**PIK Interest**") or (c) 50% as Cash Interest and 50% as PIK Interest.  Interest payments are due semi-annually in arrears on April 1 and October 1 of each year (subject to a thirty-day grace period).

16

38.     The Prepetition Second Lien PIK Notes are jointly and severally and fully and unconditionally guaranteed on a senior secured basis by all of PDSA's subsidiaries that guarantee the Prepetition First Lien Notes and are secured by second-priority liens on all of the assets of the Company and the guarantors that also serve as collateral for the Prepetition First Lien Notes.

**C.     Intercreditor Agreement**

39.     The relationship between the holders of the Prepetition First Lien Notes, on the one hand, and the holders of the Prepetition Second Lien PIK Notes (and any future junior lien debt), on the other hand, is governed by an intercreditor agreement (the "**Intercreditor Agreement**"). Pursuant to the Intercreditor Agreement, the liens securing first lien debt are effectively senior in priority to the liens securing the junior lien debt.

**D.     Common Equity**

40.     Following the Company's emergence from the 2017 Bankruptcy Proceedings, the NYSE relisted PDSA's common shares, and such shares currently trade on the NYSE under the ticker symbol "PACD."   Upon such emergence, seven institutions held approximately 86% of PDSA's outstanding shares (such institutions, together with their affiliates, the "**Major 2018 Equityholders**").

41.     As of the date hereof, PDSA has approximately 75 million common shares issued and outstanding.   Based on publicly available information, three of the seven Major 2018 Equityholders have sold all of their shares.   The four remaining Major 2018 Equityholders may own in the aggregate as much as 17.5% of PDSA's outstanding shares.   On April 7, 2020, PDSA received notice from the NYSE that its shares did not satisfy the minimum $1.00 share price standard for continued listing of its common shares, which noncompliance is subject to a cure period extended by the NYSE until December 16, 2020.   The NYSE commenced the delisting of PDSA's common shares on the Petition Date due to the filing of the Chapter 11 Cases.

**IV.**   **Circumstances Leading to the Commencement of the Chapter 11 Cases**

**A.**   **Challenges Facing the Debtors' Business**

42.   The Company strongly believed that the delevered balance sheet that it enjoyed following emergence from the 2017 Bankruptcy Proceedings positioned it for future economic success.   Indeed, since emerging from the 2017 Bankruptcy Proceedings, the Company's management increased fleet utilization and operating efficiencies to the point that, prior to the COVID-19 pandemic, the Company forecasted achieving positive levered free cash flow by the second quarter of 2021.   But then the global pandemic hit, which—in conjunction with the oil market share war—caused a significant disruption to the Debtors' business and, ultimately, required the Debtors to file for Chapter 11 protection.

43.   Since January 2020, international economies and financial markets—particularly, the oil and gas markets and, consequently, the offshore drilling industry—have been disrupted by (a) the global health crisis caused by the COVID-19 pandemic and (b) the impact from the failure of OPEC and a group of oil producing nations led by Russia to reach an agreement as to oil production cuts.   Indeed, the scope of the negative impact that the COVID-19 pandemic and the oil market share war have had on the offshore drilling industry cannot be overstated and is evidenced by, among other things, the fact that many of the Company's peer competitors are also currently availing themselves of the protections afforded by Chapter 11.

44.   In an effort to reduce the spread of the pandemic, many jurisdictions around the world began, in March 2020, enacting stay-at-home orders, forcing non-essential businesses to close, and restricting air and land travel.   Inevitably, global demand for oil and gas declined significantly, resulting in substantial oil price declines.   Contemporaneous with the onset of the global pandemic, Russia and the OPEC nations engaged in a market share war that led to a surplus oil supply in the face of declining global demand.   Although Russia and the OPEC nations

ultimately reached an agreement to reduce the global oil supply by close to 10%, a dramatic disparity between the supply and demand of oil has nevertheless persisted, which disparity has led to a severe plunge in oil prices.  Oil producers have responded to the lower demand for oil and lower oil prices by cutting their 2020 capital budgets, with the Debtors' clients generally cutting their budgets and cancelling or delaying until 2022 work that had been scheduled or awarded to the Debtors for 2020.

45.     The impact of these market conditions on the Debtors' business has been direct and significantly negative.  As discussed above, prior to the COVID-19 pandemic and oil market share war, the Debtors had four of their seven drillships operating for customers during the first quarter of 2020 and were mobilizing a fifth rig, the *Pacific Meltem*, for an anticipated Gulf of Mexico contract.  The *Pacific Bora* and the *Pacific Sharav* completed their projects in early April 2020, and contract opportunities that the Debtors had expected to materialize in the form of follow-on work for the *Pacific Sharav* and the *Pacific Bora*, and the anticipated project for the *Pacific Meltem*, were all delayed until at least 2021.  The *Pacific Santa Ana* was operating through the first quarter of 2020 on a project for Petronas that was suspended due to the COVID-19 pandemic on March 29, 2020, and is now on stand-by until January 1, 2021 at 35% of its contractual dayrate. In addition, certain contracts for the *Pacific Khamsin* and *Pacific Sharav* have been cancelled in exchange for the payment of termination fees.

46.     The global pandemic has also impacted the Debtors' day-to-day operations.  For example, as jurisdictions have closed airports and restricted air and land travel, the Debtors have faced challenges in effectuating crew changes on their rigs.  These closures and restrictions have, in some cases, required the Debtors to extend the work schedules of offshore workers past their scheduled time off or re-route travel for workers through the fewer open airports, resulting in

increased travel time, inconvenience and cost.  The Debtors also have been required to undertake extraordinary measures to keep their rigs sanitary and to ensure that their employees on the rigs are safe, including pre-boarding screening procedures and imposing a quarantine on each offshore employee and contractor prior to allowing them to return to work on the rig.

47.     In response to deteriorating market conditions, the Company implemented various initiatives to slow its rate of cash use and increase efficiency.  On April 1, 2020, the Company implemented a Company-wide 10-12% reduction in base salaries.  The Company also reduced by 10% the retainer fees payable to its directors and laid off just over 50% of offshore workforce in addition to reductions or furloughs of onshore workers.  Finally, the Company has initiated other measures to reduce its rate of cash use, including (a) closing offices, (b) reducing rig cost, shore-based office costs, operations support costs, and general and administrative expenses, and (c) undertaking other similar measures.  These initiatives have significantly reduced the Company's operating expenses with the result that, since 2020, the Company's total quarterly operating expenses (excluding depreciation and prepetition charges) have decreased by more than 40% from $96 million to $57 million.

48.     Despite having implemented these initiatives and the reduction in operating expenses that stemmed therefrom, the Company no longer has a viable path to achieving positive free cash flow on a fully levered basis within the constraints of its currently available capital.  It is my view that, if the Company is not able to restructure its balance sheet through the Chapter 11 process, the value of the Company will deteriorate further because the Company will not be well-positioned to participate in market consolidation that is currently underway and expected to increase in the coming months and years.

US-DOCS\117404149.41

B.     **Discussions with Stakeholders**

49.     In March 2020, the Debtors began exploring various restructuring alternatives with their lenders and other stakeholders.  In the first half of 2020, the Company engaged Latham & Watkins, LLP, as its legal advisor, Greenhill & Co., as its investment banker, and AlixPartners, LLP, as its restructuring advisor, to assist the Company in evaluating various alternatives to address its longer-term liquidity outlook and capital structure.  During the second quarter of 2020, the Company and its advisors began negotiations with the Ad Hoc Crossover Group, represented by Akin Gump Strauss Hauer & Feld LLP and Houlihan Lokey, Inc., and certain other holders of the Prepetition Second Lien PIK Notes regarding a comprehensive restructuring of the Company's capital structure.  The parties entered into non-disclosure agreements to allow such parties to conduct due diligence and, as part of that process, the parties began exchanging initial term sheets setting forth the proposed terms of a potential transaction.

50.     The Company did not make the approximately $31.4 million interest payment due on October 1, 2020 with respect to the Prepetition First Lien Notes and the approximately $19.6 million PIK interest payment due October 1, 2020 with respect to the Prepetition Second Lien PIK Notes and used the 30-day grace period provided under the Indentures.  The Company's election to use the grace period did not trigger a cross-default under any of the Company's debt obligations.

C.     **The RSA**

51.     After engaging in extensive good-faith and arm's-length negotiations with representatives of the Ad Hoc Crossover Group and certain other holders of the Prepetition Second Lien PIK Notes, shortly prior to commencing the Chapter 11 Cases, the Debtors, certain holders of the Prepetition First Lien Notes—which hold more than 72% of outstanding Prepetition First Lien Notes—and certain holders of the Prepetition Second Lien PIK Notes—which hold more than

73% of outstanding Prepetition Second Lien PIK Notes—agreed on the terms of the Restructuring as set forth in the RSA.

52.     The RSA is the result of extensive negotiations with the Ad Hoc Crossover Group and certain other holders of the Prepetition Second Lien PIK Notes, and provides for the reorganization of the Debtors as a going concern with a delevered capital structure and sufficient liquidity, including availability under the Exit Facility, to fund the Debtors' post-emergence business plan.  As noted above, the Restructuring contemplates the elimination of over $1 billion of the Debtors' funded debt obligations, resulting from the equitization of all amounts outstanding under the Prepetition First Lien Notes and Prepetition Second Lien PIK Notes.

53.     Under the RSA, each of the RSA signatories holding First Lien Notes Claims and/or Second Lien Notes Claims (together, the "**Consenting Creditors**") severally (but not jointly and severally) has agreed to, among other things, and so long as the RSA has not been terminated:

- negotiate in good faith and use commercially reasonable efforts to execute, deliver and implement definitive documents to which it is required to be a party and any other required agreements to effectuate and consummate the Restructuring Transactions;

- support and cooperate with the Debtors to take all commercially reasonable actions necessary to consummate the Restructuring Transactions in accordance with the Plan and the terms and conditions of the RSA, and vote to exercise any powers or rights available to it (including in any board, shareholders', or creditors' meeting or in any process requiring voting or approval to which they are legally entitled to participate) in each case, in favor of any matter requiring approval to the extent necessary to implement the Restructuring Transactions;

- support the Restructuring Transactions within the timeframes outlined in the RSA and in the definitive documents required to effectuate and consummate the Restructuring Transactions and vote in favor of the Plan all claims now or hereafter beneficially owned by such Consenting Creditor or for which it now or hereafter serves as the nominee, investment manager, or advisor for beneficial holders of claims (and not withdraw or revoke its vote with respect to the Plan except in accordance with the RSA); and

- not object to, delay, impede, or take any other action that is reasonably likely to interfere with the acceptance, implementation, or consummation of the Restructuring Transactions.

54.     Under the RSA, the Debtors have agreed to, among other things:

- negotiate in good faith and use commercially reasonable efforts to execute, deliver, and implement definitive documents and any other required agreements to effectuate and consummate the Restructuring Transactions;

- obtain any and all required governmental, regulatory, licensing, Court, or other approvals (including any necessary third-party consents) necessary to implement and/or consummate the Restructuring Transactions; and

- support and take all commercially reasonable actions necessary to consummate the Restructuring Transactions in accordance with the RSA, including meeting the following Milestones, which are set forth in Section 4 of the RSA:

  o by 11:59 p.m. (prevailing Eastern Time) on October 31, 2020, the Petition Date shall have occurred;

  o on the Petition Date, the Debtors shall have filed the First Day Pleadings, the Plan, the Disclosure Statement, the Disclosure Statement Motion, and the Combined Motion (if applicable);

  o no later than 5 calendar days after the Petition Date, the Court shall have entered the interim Cash Collateral Order;

  o no later than 16 calendar days after the Petition Date, the Court shall have entered an order conditionally approving the Disclosure Statement;

  o no later than 30 calendar days after the Petition Date, the Court shall have entered the final Cash Collateral Order;

  o no later than 55 calendar days after the Petition Date, the Court shall have entered (a) the Confirmation Order, or (b) the Combined Order, if applicable;

  o no later than 59 calendar days after the Petition Date, and after entry of the Confirmation Order, the Cayman Islands court presiding over the Cayman Proceedings shall have entered all orders and confirmations (*i.e.*, the sealed validation completing the Cayman Proceedings) relating to the Cayman Proceedings and such orders shall not be stayed, modified, revised, or vacated and shall not be subject to any pending appeal; and

  o no later than 61 calendar days after the Petition Date, the Plan Effective Date shall have occurred.

Notably, Section 6.03(b) of the RSA makes clear that the Debtors have a fiduciary-out in the event

a superior proposal arises (subject to certain procedures set forth in the RSA) and that the Debtors'

boards of directors can at all times act consistent with their fiduciary duties.  Specifically, Section

6.03(b) of the RSA provides that nothing in the RSA requires the Debtors or the board of directors, board of managers, or similar governing body of a Debtor, after consulting with counsel, to take any action or refrain from any action with respect to the Restructuring Transactions to the extent taking or failing to take such action would be inconsistent with or a violation of applicable law or its fiduciary obligations under applicable law, although any such action may result in termination rights set forth in the Restructuring Transactions.

55.     The RSA contains customary representations, warranties and covenants.   In addition, the RSA provides that the Plan will include customary releases (including consensual third party releases) to the fullest extent permitted by law for the benefit of, among other parties, the Debtors, the Consenting Creditors, the Backstop Parties, and certain other parties specified therein.  Moreover, such releases, as well as additional exculpation and indemnification provisions, including the third-party releases, are documented in <u>Article VIII</u> of the Plan.  As noted above, all holders of claims or interests will have the opportunity to opt out of the third-party releases set forth in <u>Article VIII</u> of the Plan.

56.     The RSA may be terminated (a) upon mutual written agreement, (b) if certain Milestones are not met, and (c) upon the occurrence and during the continuation of certain other events set forth in Section 10 of the RSA.

57.     The Debtors intend to use the centralized forum provided by Chapter 11 to effectuate their Restructuring, stabilize their business, establish sensible cash management arrangements, and provide information to all interested creditors and stockholders.  The Debtors seek to continue operations in the ordinary course and limit, to the full extent possible, capital expenditures in order to preserve value and emerge from their Chapter 11 Cases as a stronger go-forward business.

## V.     The Key Terms of the Restructuring and the Proposed Timeline for the Chapter 11 Cases

### A.     The Restructuring

58.     The Plan contemplates the implementation of the Restructuring agreed to under the RSA through the following transactions:

- on the Petition Date (immediately prior to the filing of the Debtors' voluntary Chapter 11 petitions), the Company commenced the process of effectuating the Cayman Proceedings for PDCL in order to gain recognition of the Restructuring in the Cayman Islands;

- PDSA's common stock will no longer be listed on the NYSE, and PDSA will terminate its registration under the Securities Exchange Act of 1934, as amended;

- on the Plan Effective Date, the Reorganized Debtors will issue, in full satisfaction of allowed First Lien Notes Claims and Second Lien Notes Claims, 91.5% of the New PDC Equity to holders of First Lien Notes Claims and 8.5% of the New PDC Equity to holders of Second Lien Notes Claims (subject to dilution); and

- on the Plan Effective Date, the Reorganized Debtors will execute all instruments, certificates, and other documents required to implement the Exit Facility and they shall enter into the Exit Facility.

59.     The holders of First Lien Notes Claims and Second Lien Notes Claims are the only creditors whose claims are both impaired and entitled to vote on the Plan.  With respect to the First Lien Notes Claims in an estimated amount of $786.5 million, the Plan provides that each such holder will receive (a) its *pro rata* share of 91.5% of the New PDC Equity, subject to dilution (the "**Permitted Dilution**") on account of any equity issued, if any, pursuant to a management incentive plan and the New 2L Warrants (as defined below), and (b) cash sufficient to satisfy any accrued and unpaid Indenture Trustee fees and expenses pursuant to the First Lien Notes Indenture. As set forth in the Disclosure Statement, the Debtors and their advisors estimate that holders of First Lien Notes Claims will receive an economic recovery of approximately 82% on account of their claims.

60.     With respect to the Second Lien Notes Claims in an estimated amount of $349.1 million, the Plan provides that each such holder will receive (a) its *pro rata* share of (i) 8.5% of the New PDC Equity, subject to the Permitted Dilution and (ii) 7-year warrants to purchase its *pro rata* share of 15% of the New PDC Equity (the "**New 2L Warrants**"); and (b) cash sufficient to satisfy any accrued and unpaid Indenture Trustee fees and expenses pursuant to the Second Lien Notes Indenture.  As set forth in the Disclosure Statement, the Debtors and their advisors estimate that holders of Second Lien Notes Claims will receive an economic recovery of approximately 32% on account of their claims.

61.     In light of the circumstances and impairment of the holders of Second Lien Notes Claims, neither holders of General Unsecured Claims, Intercompany Claims, nor Allowed Interests in PDSA (the "**Existing Lux Beneficial Interests**") will receive any recovery on account of such claims and interests.  Because such creditors and interest holders are not receiving any recovery on account of their claims and interests, they are deemed to reject the Plan and therefore not entitled to vote on the Plan.  The Debtors intend, however, to seek first day relief that will allow them to pay the prepetition claims of those of their vendors who could assert maritime and other liens, foreign vendors, and certain critical vendors, as set forth on **Exhibit A**.

62.     As described in the Disclosure Statement Motion, assuming the Court grants conditional approval of the Disclosure Statement at the hearing scheduled for November 12, 2020, the Debtors will instruct Prime Clerk LLC, as their proposed solicitation agent, to mail the Disclosure Statement, together with all exhibits thereto, including the Plan (and the RSA, as Exhibit B to the Disclosure Statement), to holders of impaired claims entitled to vote on the Plan on the solicitation commencement date established by the Court, which date the Debtors hope will be in mid-November, and request that the voting creditors submit their ballots by the proposed

voting deadline approximately 25 days later (the "**Voting Deadline**").  Based on my discussions

with the Debtors' advisors, the Voting Deadline that the Debtors intend to request from this Court

will provide the holders of First Lien Notes Claims and Second Lien Notes Claims with adequate

time to submit votes on the Plan.

63.     The Plan provides for, among other things, the following treatment of claims and

interests that are not entitled to vote on the Plan:

- Administrative Claims and Priority Tax Claims will be paid in full in Cash, or otherwise receive treatment consistent with the provisions of Section 1129(a)(9) of the Bankruptcy Code;

- other Secured Claims will, at the election of the applicable Debtor(s) (with the consent of the Required Consenting First Lien Creditors) or Reorganized Debtor(s), receive (a) payment in full in Cash, (b) the collateral securing their claims, (c) reinstatement of their claims, or (d) such other treatment rendering their claims unimpaired in accordance with Section 1124 of the Bankruptcy Code;

- General Unsecured Claims will receive no recovery on account of such claims and, on the Effective Date, will be cancelled, released, extinguished, and discharged;

- remaining Intercompany Interests will be, at the option of the Debtors (with the consent of the Consenting Creditors) or the Reorganized Debtors, either reinstated or cancelled and released without any distribution;

- Claims legally subordinated to General Unsecured Claims or Section 510(b) Claims will receive no recovery and all such claims will be cancelled, released, extinguished, and discharged; and

- the Existing Lux Beneficial Interests will receive no distribution on account of such Interests, all such Interests will be cancelled, released, extinguished, and discharged, and title to such Interests will be deemed transferred to the Estate Representative or another Reorganized Debtor.

64.     In addition, the Plan contemplates the payment of fees and expenses incurred by

the Debtors' professionals (subject to approval of their respective retention applications and

applicable fee applications) and advisors to the Ad Hoc Crossover Group.

B.     **Exit Financing**

65.     The RSA also addresses the Debtors' immediate and long term liquidity needs through the term sheet attached as Exhibit B to the RSA (the "**Exit Facility Term Sheet**"), which provides the material terms of the Exit Facility.  Specifically, the Exit Facility Term Sheet sets forth the terms and conditions under which certain holders of First Lien Notes Claims and the Backstop Parties (as defined in the Exit Facility Term Sheet) have committed to provide the Exit Facility consisting of a new senior secured delayed draw term loan credit facility in the aggregate principal amount of up to $80 million.

66.     The primary purpose of the Exit Facility and the loans thereunder is to provide the Debtors with postpetition liquidity upon emergence from the Chapter 11 Cases.

C.     **Proposed Timeline for the Chapter 11 Cases**

67.     As noted above, in accordance with the RSA, the Debtors are obligated to proceed with the implementation of the Plan pursuant to certain Milestones contained in the RSA.  Among the Milestones are the requirements that the Debtors commence the Chapter 11 Cases by no later than 11:59 p.m. on October 31, 2020 (which Milestone has, of course, now been satisfied), obtain confirmation of the Plan no later than 55 calendar days after the Petition Date, which will be December 24, 2020, and consummate the Plan by no later than 61 calendar days after the Petition Date, which will be December 31, 2020.  Contemporaneous with the filing of this Declaration, the Debtors have filed the Disclosure Statement Motion seeking entry of (a) an order setting a preliminary hearing (approximately 12 days after the Petition Date) at which conditional approval of the Disclosure Statement can be obtained and (b) a subsequent order conditionally approving the Disclosure Statement and related forms scheduling dates and deadlines in connection with the approval of the Disclosure Statement and confirmation of the Plan.

68.     Critically, the Disclosure Statement Motion seeks approval of the Combined Hearing Notice, approval of the ballots to be sent to the voting classes, a cover letter accompanying the ballots, and the notice of non-voting status and opt-out opportunity.  Approval of these notices and forms on a conditional basis will put the Debtors on track to emerge from the Chapter 11 Cases on the timeline contemplated by the RSA, which will minimize the impact of the Chapter 11 Cases on the Debtors' business.  The Debtors anticipate that notice of the confirmation hearing will be mailed to all known holders of claims and interests at least 28 days before the date by which objections to Confirmation must be filed with the Court.

69.     Achieving the various Milestones under the RSA is crucial to maintaining the support of the Ad Hoc Crossover Group and reorganizing the Debtors successfully.  Moreover, as noted above, an expeditious emergence from bankruptcy will minimize the adverse effects of the Debtors' Chapter 11 Cases upon the Debtors' business.

## VI.     Relief Sought in the Debtors' First Day Motions

70.     Contemporaneous herewith, the Debtors filed numerous First Day Motions in the Chapter 11 Cases seeking orders granting various forms of relief intended to provide stability and facilitate the Debtors' continued operations and the efficient administration of the Chapter 11 Cases, as well as ensuring the swift consummation of the Plan.

71.     The Debtors seek by the First Day Motions to, among other things, (a) ensure the continuation of their business operations and cash management system without interruption, (b) preserve valuable relationships with trade vendors and other creditors, and (c) through the relief sought in the Disclosure Statement Motion, schedule a combined hearing for the Court to consider the adequacy of the Disclosure Statement, approval of the Debtors' solicitation procedures, and confirmation of the Plan.

72.     I am familiar with the contents of each of the First Day Motions, and I believe the Debtors would suffer immediate and irreparable harm absent the ability to continue their business operations as sought in the First Day Motions.  In my opinion, approval of the relief sought in the First Day Motions will be critical to the Debtors' efforts to reorganize through the Chapter 11 Cases efficiently and with minimized disruptions to their business operations, thereby permitting the Debtors to preserve and maximize value and successfully emerge from Chapter 11 more competitively-positioned.

73.     In addition to the Disclosure Statement Motion (discussed above), the First Day Motions include:

I.     Administrative Motions

   A.   *Debtors' <u>Emergency</u> Motion for Entry of an Order Directing Joint Administration of Related Chapter 11 Cases* (the "**<u>Joint Administration Motion</u>**");

   B.   *Debtors' <u>Emergency</u> Motion for Entry of Order (I) Authorizing the Debtors to File a Consolidated Creditor Matrix and List of the Thirty (30) Largest Unsecured Creditors, (II) Waiving the Requirement to File a List of and Provide Notice to Equity Security Holders, (III) Authorizing the Debtors to Redact Certain Personal Identification Information, and (IV) Approving the Form and Manner of Notifying Creditors of the Commencement of the Chapter 11 Cases and Other Information* (the "**<u>Creditor Matrix Motion</u>**");

   C.   *Debtors' <u>Emergency</u> Application for Entry of Order Authorizing the Employment and Retention of Prime Clerk LLC as Claims, Noticing, and Solicitation Agent* (the "**<u>Prime Clerk Retention Application</u>**"); and

   D.   *Debtors' <u>Emergency</u> Motion for Entry of an Order (I) Extending the Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases, Statements of Financial Affairs, and Rule 2015.3 Financial Reports, and (II) Granting Related Relief* (the "**<u>Statements Extension Motion</u>**").

II.    Operational Motions

   A.   *Debtors' <u>Emergency</u> Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Utilize Cash Collateral; (II) Granting Adequate*

*Protection to the Prepetition Secured Parties; (III) Modifying Automatic Stay; and (IV) Granting Related Relief* (the "**Cash Collateral Motion**");

B.  *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing Continuation of Existing Cash Management System, Including Maintenance of Existing Bank Accounts, Checks, and Business Forms, (II) Authorizing Continuation of Existing Deposit and Investment Practices, (III) Authorizing Continuation of Intercompany Transactions, and (IV) Granting Administrative Expense Status to Certain Postpetition Intercompany Claims* (the "**Cash Management Motion**");

C.  *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to Honor and Incur Obligations Under Customer Contracts in the Ordinary Course, (II) Authorizing the Debtors to Enter into New Customer Contracts and (III) Granting Related Relief* (the "**Customer Contracts Motion**");

D.  *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Pay their Prepetition Insurance Obligations, and (B) Maintain their Postpetition Insurance Coverage; (II) Modifying the Automatic Stay to Permit the Employees of Non-Debtor Affiliates to Proceed with Workers' Compensation Claims and Offshore Employee Claims Against the Debtors; and (III) Granting Related Relief* (the "**Insurance Motion**");

E.  *Debtors' Emergency Motion for Entry of Interim and Final Orders Authorizing (I) the Payment of the Prepetition Trade Claims of (A) Vendors Able to Assert Maritime and Other Liens, (B) Vendors Holding Claims Under 11 U.S.C. § 503(b)(9), (C) Foreign Vendors, (D) Vendors with Outstanding Orders as of the Petition Date, and (E) Critical Vendors and (II) Banks to Honor Prepetition Checks and Fund Transfers for Authorized Payments* (the "**Prepetition Key Claims Motion**");

F.  *Debtors' Emergency Motion for Entry of an Order Authorizing Payment of Prepetition Taxes and Fees* (the "**Taxes and Fees Motion**"); and

G.  *Debtors' Emergency Motion for Entry of Order (I) Prohibiting Utility Companies From Altering or Discontinuing Service on Account of Prepetition Invoices, (II) Approving Deposit as Adequate Assurance of Payment, and (III) Establishing Procedures for Resolving Requests by Utility Companies for Additional Assurance of Payment* (the "**Utilities Motion**").

74.    I have read and understand each of the First Day Motions and the relief requested therein.  A description of the relief requested and the facts supporting each of the First Day Motions is attached hereto as **Exhibit A**.  Based on my review, and to the best of my knowledge and belief, the factual statements contained in each of the First Day Motions are true and accurate and each

such factual statement is incorporated herein by reference.  I believe that the relief requested in the First Day Motions is necessary, in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will allow the Debtors to operate with minimal disruption during the pendency of the Chapter 11 Cases.  Failure to grant the relief requested in any of the First Day Motions may result in immediate and irreparable harm to the Debtors, their businesses, and their estates.  Accordingly, for the reasons set forth herein and in each respective First Day Motion, the Court should grant the relief requested in each of the First Day Motions.

[*The remainder of this page intentionally left blank*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: October 30, 2020
      Houston, Texas

                Pacific Drilling S.A.
                on behalf of itself and each of its Debtor Affiliates

                By:      */s/ James W. Harris*
                Name:  James W. Harris
                Title:    Chief Financial Officer